# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 40320**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Joshua M. DUGAN**
First Lieutenant (O-2), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 23 October 2023

————————————

*Military Judge:* Brett A. Landry.

*Sentence:* Sentence adjudged on 30 March 2022 by GCM convened at Cannon Air Force Base, New Mexico. Sentence entered by military judge on 18 May 2022: Dismissal, confinement for 70 days, and a reprimand.

*For Appellant:* Major Heather M. Caine, USAF; Major Nicole Mouakar, USAF.

*For Appellee:* Lieutenant Colonel Thomas J. Alford, USAF; Captain Olivia B. Hoff, USAF; Captain Kate E. Lee, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, ANNEXSTAD, and GRUEN, *Appellate Military Judges*.

Senior Judge ANNEXSTAD delivered the opinion of the court, in which Chief Judge JOHNSON and Judge GRUEN joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

ANNEXSTAD, Senior Judge:

At a general court-martial, a military judge convicted Appellant, in accordance with his pleas, of one specification of assault on a commissioned officer and one specification of assault consummated by a battery, in violation of Article 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 928.[1] A military judge also convicted Appellant, contrary to his plea, of one specification of wrongful use of lysergic acid diethylamide (LSD), in violation of Article 112a, UCMJ, 10 U.S.C. § 912a. The military judge sentenced Appellant to a dismissal, confinement for 70 days, and a reprimand. The convening authority took no action on the findings or sentence.[2]

Appellant raises four assignments of error which we have reordered and reworded: (1) whether Appellant's conviction for wrongful use of LSD was legally and factually sufficient; (2) whether Appellant was denied the effective assistance of counsel under the Sixth Amendment[3] due to alleged deficiencies in the performance of his trial defense counsel; (3) whether Appellant's guilty pleas were knowing and voluntary; and (4) whether the specification for assault upon a commissioned officer failed to state an offense.[4]

With respect to issue (4) we have carefully considered Appellant's contentions and find this issue does not require further discussion or warrant relief. *See United States v. Guinn*, 81 M.J. 195, 204 (C.A.A.F. 2021) (citing *United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987)).

Finding no error that materially prejudiced a substantial right of Appellant, we affirm the findings and sentence.

## I. BACKGROUND

Appellant was a remotely piloted aircraft operator stationed at Cannon Air Force Base (AFB), New Mexico. At the time of the offenses, Appellant lived in an off-base house in Clovis, New Mexico, with his wife and two daughters. On 4 July 2020, Appellant's wife and two daughters were out of town, and one of his close friends, First Lieutenant (1st Lt) RP, was visiting from Vance AFB, Oklahoma.

---

[1] All references to the UCMJ and the Rules for Courts-Martial (R.C.M) are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] On 9 May 2022, the convening authority waived all automatic forfeitures for six months, or release from confinement, whichever was sooner, with the waiver commencing 14 days after the sentence was adjudged.

[3] U.S. CONST. amend. VI.

[4] Appellant personally raised issue (4) pursuant to *United States v. Grostefon,* 12 M.J. 431 (C.M.A. 1982).

On the evening of 4 to 5 July 2020, one of Appellant's neighbors, GG, was socializing outdoors with his wife and several friends and neighbors. At Appellant's trial, GG testified that around 1900 he remembered Appellant and 1st Lt RP being dropped off at Appellant's house. He testified that they went directly into Appellant's house and that he did not see either of them until later in the evening. Around midnight, GG noticed Appellant's dog had gotten out of Appellant's house. This was not the first time that Appellant's dog had been out loose that evening, so GG and the others took control of the dog and decided to keep it overnight for safety and return it to Appellant in the morning.

Shortly thereafter Appellant appeared from his house and approached the group, "yelling and screaming" and asking where his dog was. GG and the others told Appellant they had his dog and agreed to return it. According to GG, Appellant then "screamed" at them that he was "high on LSD." As they continued to explain to Appellant that they had his dog because he let her out, Appellant began to say he was "the smartest man alive;" that he had "run the simulation through and through;" and that he was "going to monetize it." Appellant again told them he was on LSD and started walking up and down the street. GG, 1st Lt SF, and several others followed Appellant to ensure he did not run off into traffic. Appellant suddenly punched 1st Lt SF in the face, at which point 1st Lt SF left. At another point, Appellant attempted to enter the locked home of another neighbor without permission.

Around this time, 1st Lt RP emerged from Appellant's house and came out onto the street. Appellant approached 1st Lt RP and continued to repeat what he had been saying to the other neighbors—that he was the "smartest man alive." Appellant began to move back up the driveway of his neighbor's house, at which point GG approached Appellant. GG testified that he put his hands in his pockets so as to "appear that [he] was no threat to [Appellant]." Appellant punched GG in the face. GG then called the police.

Civilian police began to arrive at approximately 0051 hours. The first to arrive was Officer TR, who approached Appellant and 1st Lt RP who were walking around in the street. Appellant told Officer TR that "[he] and his buddy w[ere] on LSD and it was the smartest thing they've done." Officer TR asked Appellant if he hit someone, to which Appellant replied, "Oh, I absolutely destroyed somebody." Shortly thereafter, Appellant punched Officer TR in the face.

With some difficulty, Officer TR and other officers were able to subdue and restrain Appellant, who resisted despite being repeatedly tased, pepper sprayed, and "dry stun[ned]." Officer TR testified that the taser, pepper spray, and dry stun had little to no effect on Appellant. After Appellant was apprehended, he persisted in incessantly shouting repetitive and incoherent statements. Examples of such statements captured on police body-worn camera

video include: "We have literally lived out every reality;" "The hacker likes to think we're going to hell;" "[1st Lt RP]! We hit the quadrillionth, so the brain named itself;" "This is the hundred millionth time that the brain has named itself;" "It's so smart on an LSD trip that I just hit a hundred billion times in the universe in which I—the brain named itself;" and "This is the classic example of one human being getting too smart to even finish this sentence."

Officer TR described his observations of Appellant that night. First, Appellant was extremely hyper, sweating, and had "pretty dilated" pupils. Further, Appellant had difficulty following directions, but did not smell like alcohol and his speech was not slurred. In short, Officer TR did not believe that Appellant was intoxicated by alcohol consumption but was under the influence of LSD. Appellant later received medical attention, which included a dose of benzodiazepine—a sedative used to counter the effects of hallucinogens such as LSD.

On 5 July 2020 Appellant provided a urine sample, which was subsequently sent to the Air Force Drug Testing Laboratory (AFDTL) for analysis. The Government failed to specifically request that the AFDTL test Appellant's sample for the presence of LSD or its metabolite. Ultimately, Appellant's urine sample tested negative for the presence of other drugs and was subsequently destroyed. At trial, the Government introduced no evidence that Appellant's urine was tested for the presence of LSD.

During the ensuing investigation, the Office of Special Investigations (OSI) searched Appellant's home for evidence related to drug use. The search uncovered three empty bottles of cough syrup, the main ingredient of which was dextromethorphan (DXM).

## II. DISCUSSION

### A. Legal and Factual Sufficiency

Appellant contends his conviction for wrongfully using LSD was legally and factually insufficient. He generally contends that the Government presented "no evidence" of his knowing use of LSD, and leans on the absence of a positive urinalysis result for the proposition that this court cannot be convinced beyond a reasonable doubt that Appellant used LSD. We disagree and find no relief is warranted.

### 1. Additional Background

After the guilty plea to both assault specifications (Specifications 1 and 2 of Charge II), the court proceeded into trial on the merits on the lone specification for Charge I, wrongful use of LSD. During trial, the Government presented videos from a neighbor's security camera and Officer TR's body-worn camera as exhibits. The Government also presented the testimony of GG and Officer

TR who testified regarding Appellant's admissions and erratic behavior. Finally, the Government presented the testimony of two expert witnesses, Mr. GJ, a forensic toxicologist, and Dr. JT, a forensic psychologist.

Specifically, during his testimony, Mr. GJ stated that after reviewing the evidence, to include the videos from the incident, it was his opinion that Appellant had used LSD on the evening of 4 to 5 July 2020. Mr. GJ pointed to the reported dilation of Appellant's pupils as well as LSD's tendency to cause depersonalization, which he indicated manifests in behaviors such as "the ranting, the pacing, the wandering, references to time loops, and commentary about oneself" exhibited by Appellant. Mr. GJ further explained that depersonalization causes people to have an "altered reality" and often results in "eureka moments where [they] come to realize something big and important." Mr. GJ then discussed how hallucinogens, like LSD, interrupt signals to the brain such as pain. When specifically asked whether DXM could have the same effect, Mr. GJ noted that although taking large amounts of DXM could produce a "trip" like those caused by LSD, it would also likely result in sedation, slurred speech, and "profound incoordination."

Dr. JT, the forensic psychologist, testified that while alcohol or DXM could produce "the type of psychotic behavior … you see here," both substances would also have a "calm, sedative effect," not the "heightened mood" caused by hallucinogens such as LSD. Dr. JT also highlighted the fact that medical providers gave Appellant benzodiazepine, which is used to "bring [patients] down." Dr. JT explained that if someone was in a sedative state—such as the kind that would result from consuming alcohol or large amounts of DXM—they would not be given benzodiazepine because "you wouldn't give a sedative to someone who is sedated." Dr. JT further noted that LSD has a significant impact on memory and people who do LSD are told to journal during the "trip" because it is difficult to remember what happened afterwards.

### 2. Law

Issues of legal and factual sufficiency are reviewed de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). "Our assessment of legal and factual sufficiency is limited to evidence produced at trial." *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citing *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993)), *rev. denied*, 82 M.J. 312 (C.A.A.F. 2022).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt,

however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted), *cert. denied*, __ U.S. __, 139 S. Ct. 1641 (2019). The test for legal sufficiency "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Unites States v. Oliver*, 70 M.J. 64, 68 (C.A.A.F. 2011) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319 (1973)).

"The test for factual sufficiency is 'whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses,' [this] court is 'convinced of the [appellant]'s guilt beyond a reasonable doubt.'" *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399). This court's review of the factual sufficiency of evidence for findings is limited to the evidence admitted at trial. *See* Article 66(c), UCMJ; *United States v. Beatty*, 64 M.J. 456, 458 (C.A.A.F. 2007) (citations omitted).

In order to convict Appellant of violating Article 112a, UCMJ, as charged here, the Government was required to prove beyond a reasonable doubt that Appellant used a controlled substance, LSD, and such use was wrongful. *See* 10 U.S.C. § 912a; *Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 50.b.(2). "[U]se . . . of a controlled substance is wrongful if it is without legal justification or authorization." *MCM*, pt. IV, ¶ 50.c.(5). "[U]se . . . of a controlled substance may be inferred to be wrongful in the absence of evidence to the contrary." *Id*.

### 3. Analysis

Despite the absence of a positive urinalysis result for LSD we find that the Government introduced convincing evidence of Appellant's guilt. Here, the Government presented testimony from multiple witnesses at trial that Appellant stated, multiple times and in no uncertain terms, that he had used LSD on the evening of 4 to 5 July 2020. This testimony was supported by video

evidence which not only confirmed that Appellant made these incriminating statements that he had used LSD, but more importantly displayed Appellant's alarming behavior on the night in question. On this latter point, multiple witnesses testified about Appellant's behavior while he was outside—his rambling commentary about being the "smartest" person and "running the simulation," as well as the absence of pain reactions despite being subjected to non-lethal force. Furthermore, two different expert witnesses opined after reviewing the evidence that Appellant exhibited behavior indicative of someone who used a controlled substance, specifically LSD. Finally, the Government presented evidence that would tend to negate the possibility that Appellant was under the influence of another intoxicant such as alcohol or DXM.

We conclude that viewing the evidence in the light most favorable to the Prosecution, a rational trier of fact could have found the essential elements of wrongful use of LSD beyond a reasonable doubt. *See Robinson*, 77 M.J. at 297−98. Furthermore, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are ourselves convinced of Appellant's guilt beyond a reasonable doubt. *See Reed*, 54 M.J. at 41 (citation omitted).

## B. Claim of Ineffective Assistance of Counsel

Appellant argues that he was denied effective assistance of counsel under the Sixth Amendment due to alleged deficiencies in the performance of his trial defense counsel. Specifically, Appellant states that his trial defense counsel failed to: (1) properly advise him as to the maximum punishment for the specification concerning his assault of a commissioned officer; (2) object to admission of Appellant's statements for lack of corroboration; and (3) move to dismiss the specification and charge concerning Appellant's wrongful use of LSD due to Government's destruction of Appellant's urine sample. We disagree with Appellant's contentions and find no relief is warranted.

### 1. Additional Background

On 9 August 2023, we granted Appellant's request to attach four declarations for our consideration. The four declarations included a declaration from Appellant, his wife, and both of his parents individually. On the same day, we ordered both of Appellant's trial defense counsel, Captain (Capt) ER and Capt JW, to provide responsive declarations to address Appellant's ineffective assistance of counsel claims. On 8 September 2023, the court attached those declarations to the record of trial. On 3 October 2023, we granted Appellant's

request to attach one additional declaration from Appellant.[5] We have considered whether a post-trial evidentiary hearing is required to resolve any factual disputes between Appellant's assertions and his trial defense counsel's assertions. *See United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997); *United States v. DuBay,* 37 C.M.R. 411, 413 (C.M.A. 1967). We find a hearing unnecessary to resolve Appellant's claims.

Both Capt ER and Capt JW submitted declarations to this court. The declarations provide that Appellant engaged the services of trial defense counsel within a week of the incident. Trial defense counsel knew that LSD required special testing, and that Appellant's urine sample would be destroyed if the Prosecution failed to request such testing and the sample was otherwise negative for drugs. Trial defense counsel determined that a negative test result—and no sample—would serve Appellant's odds better than having the sample available for re-testing, and therefore decided not to request preservation.

To combat the drug charge, trial defense counsel employed a forensic toxicologist and forensic psychologist as confidential consultants and discussed the case with them at length. Trial defense counsel's forensic toxicologist opined multiple times that the behavior exhibited by Appellant on the body camera footage was most consistent with LSD or Phencyclidine (PCP) use. The expert further opined that ingesting cough syrup—or a combination of substances to include cough syrup—would not have produced the behaviors exhibited by Appellant.

Trial defense counsel also received discovery that included body-worn camera footage in which a police officer can be heard asking 1st Lt RP if he took what Appellant took. 1st Lt RP was captured on camera saying, "I might have taken some acid, yeah." Based on this discovery, trial defense counsel decided, as a matter of strategy, not to file a motion to suppress Appellant's statements alleging lack of corroboration. Capt JW stated the decision was made for two reasons. First, Appellant's statements were voluntary, and they did not have a basis for suppression; and second, they "did not want to open the door to evidence or testimony from [1st] Lt RP."

On the first day of trial, Appellant—through trial defense counsel—elected trial by military judge alone and entered a plea of guilty to the two assault specifications (Specifications 1 and 2 of Charge II). After trial defense counsel announced Appellant's pleas, the military judge informed Appellant that his pleas of guilty would not be accepted unless he understood their meaning and

---

[5] Because the issue was raised in the record but was not fully resolvable by those materials, we may consider the declarations submitted by the parties consistent with *United States v. Jesse*, 79 M.J. 437, 444 (C.A.A.F. 2020).

effect. After going through the factual basis for Appellant's pleas, the military judge informed Appellant of the maximum authorized punishment based on his guilty pleas. The military judge then asked Appellant if he had had enough time and opportunity to discuss the case with his counsel and Appellant responded in the affirmative. In the ensuing colloquy, Appellant indicated to the military judge that he was pleading voluntarily and understood the meaning of his pleas. At the end, the military judge instructed Appellant to consult with his defense counsel one final time, at which point trial defense counsel requested a recess.

During the recess, Capt JW explained to Appellant that she had erred in her original calculations of the maximum punishment and then correctly advised him on the maximum punishment for the offense concerning his assault on a commissioned officer. She also explained to Appellant that he could withdraw his guilty plea if he was uncomfortable with going forward. Appellant indicated that he understood his options and informed his defense counsel that he wished to proceed with the guilty plea.

After the recess, the military judge asked Appellant if he had had enough time to talk to his counsel, and Appellant indicated he had. The military judge then asked Appellant, "Do you still want to plead guilty?" and Appellant replied in the affirmative. After accepting Appellant's guilty plea, the military judge reminded Appellant that he could request to withdraw his guilty plea any time before sentence was announced, and that such a request would be granted if there was a good reason. Appellant did not indicate any desire to withdraw his guilty plea any time before sentence was announced.

On 1 April 2022, the day after the trial concluded, Capt JW again discussed Appellant's guilty plea with Appellant and formally documented in a memorandum for record (MFR) the above conversation they had during the recess, specifically including her initial incorrect advice on the maximum punishment for the assault on a commissioned officer specification. The MFR also provided that Appellant was correctly advised of the maximum sentence, and further, that Appellant was advised that he could withdraw his plea at any time before sentence was announced. Additionally, in the MFR, Appellant, himself, stated:

> I have reviewed this [MFR] and agree that Capt [JW] informed me of my right to withdraw from the plea based on the new information. She admitted error, corrected herself, and she informed me of the actual maximum punishment before my guilty plea was accepted by the military judge and well before the announcement of the sentence. *I voluntarily continued with the plea ultimately pleading guilty to Charge II, Specification 1 for which I received 15 days confinement as opposed to the potential 3 years available.*

(Emphasis added). Appellant signed the MFR on 1 April 2022.

**2. Law**

The Sixth Amendment guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). In assessing the effectiveness of counsel, we apply the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *See Gilley*, 56 M.J. at 124 (citing *United States v. Grigoruk*, 52 M.J. 312, 315 (C.A.A.F. 2000)). We review allegations of ineffective assistance de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009)).

We utilize the following three-part test to determine whether the presumption of competence has been overcome:

> 1. Are the appellant's allegations true; if so, "is there a reasonable explanation for counsel's actions"?
>
> 2. If the allegations are true, did defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers"?
>
> 3. If defense counsel was ineffective, is there "a reasonable probability that, absent the errors," there would have been a different result?

*Id.* (alterations in original) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)). The burden is on an appellant to demonstrate both that counsel's performance was deficient, and the deficiency resulted in prejudice. *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citation omitted). An appellant overcomes the presumption of competence only when he shows there were "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.

"Defense counsel do not perform deficiently when they make a strategic decision to accept a risk or forego a potential benefit, where it is objectively reasonable to do so." *Datavs*, 71 M.J. at 424 (citations omitted). In reviewing the decisions and actions of trial defense counsel, this court ordinarily does not second-guess strategic or tactical decisions. *See United States v. Morgan*, 37 M.J. 407, 410 (C.M.A. 1993) (citations omitted). It is only in those limited circumstances where a purported "strategic" or "deliberate" decision is unreasonable or based on inadequate investigation that it can provide the foundation for a finding of ineffective assistance. *See United States v. Davis*, 60 M.J. 469, 474 (C.A.A.F. 2005).

"When a claim of ineffective assistance of counsel is premised on counsel's failure to make a motion . . . , an appellant must show that there is a reasonable probability that such a motion would have been meritorious." *United States v. Beauge*, 82 M.J. 157, 167 (C.A.A.F. 2022) (omission in the original) (citation omitted).

This court does "not measure deficiency based on the success of a trial defense counsel's strategy, but instead examine[s] 'whether counsel made an objectively reasonable choice in strategy' from the available alternatives." *United States v. Akbar*, 74 M.J. 364, 379 (C.A.A.F. 2015) (quoting *United States v. Dewrell*, 55 M.J. 131, 136 (C.A.A.F. 2001)). For this reason, defense counsel receive wide latitude in making tactical decisions. *Cullen v. Pinholster*, 563 U.S. 170, 195 (2011) (citing *Strickland*, 466 U.S. at 689). This also applies to trial defense counsel's strategic decisions. *Morgan*, 37 M.J. at 410. "[S]trategic choices made by trial defense counsel are virtually unchallengeable after thorough investigation of the law and the facts relevant to the plausible options." *Akbar*, 74 M.J. at 371 (internal quotation marks and citation omitted).

In making this determination, courts must be "highly deferential" to trial defense counsel and make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Moreover, "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011) (citation omitted).

In adjudicating ineffective assistance of counsel claims, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Datavs*, 71 M.J. at 424–25 (first alteration in original) (quoting *Strickland*, 466 U.S. at 697).

**3. Analysis**

We address Appellant's contentions in the order presented. Appellant first argues that his trial defense counsel were deficient for misadvising him as to the maximum punishment for the specification concerning his assault on a commissioned officer. Here the record clearly establishes that he was initially misadvised by his defense counsel on the maximum punishment for the above-mentioned offense. However, we find the record also clearly establishes that he was correctly advised of the maximum by both his counsel and the military judge prior to the acceptance of his guilty plea. Moreover, Appellant signed a memorandum, indicating that he was correctly advised on the maximum punishment before the military judge accepted his guilty plea, and that he subsequently knowingly and voluntarily agreed to plead guilty. We therefore find that Appellant has not met his burden to demonstrate prejudice.

Concerning Appellant's second contention—that his trial defense counsel should have objected to admission of Appellant's incriminating statements for lack of corroboration—we find Appellant has failed to demonstrate deficient performance. Here, we find the record sufficiently supports trial defense counsel's conclusion that there was no legal basis to challenge the admission of Appellant's statements *See* Mil. R. Evid. 304(c) ("The independent evidence need only raise an inference of the truth of the admission or confession."). Moreover, even if there was a basis to challenge Appellant's statements, his trial defense counsel made a strategic decision not to risk opening the door to evidence or testimony that would corroborate Appellant's statements. We find this decision reasonable, and we do not second-guess reasonable strategic or tactical decisions from trial defense counsel. *Morgan,* 37 M.J. at 410.

Lastly, we consider Appellant's third contention—that Appellant's trial defense counsel failed to move the military judge to dismiss the specification and charge concerning Appellant's wrongful use of LSD due to the Government's destruction of Appellant's urine sample. We again find that Appellant has failed his burden to demonstrate deficient performance.

Here, the record demonstrates that trial defense counsel, who began representing Appellant a week after the incident, knew the sample would be destroyed if the Government did not request special testing and the results of the drug screen were negative. Trial defense counsel made a strategic decision not to request preservation of the sample because they believed not having the sample available would be in Appellant's best interest. We find this decision was a reasonable one because by not requesting the Government preserve the sample, trial defense counsel arguably neutralized the potentially damaging effect that Appellant's urine sample might have had on his chances at trial. Though such preservation and retesting could, in theory, have resulted in an exculpatory negative urinalysis result, the opposite is also true—proper testing could have produced a positive urinalysis, which would have strengthened the evidence against Appellant. Here, trial defense counsel stated that the cost-benefit analysis was clear: trial defense counsel forewent the potential benefit of a negative urinalysis in favor of guaranteeing that there would continue to be no positive urinalysis. Given that trial defense counsel could have prevented the loss of the urine sample, we also find there was no basis to request dismissal or abatement under Rule for Courts-Martial (R.C.M.) 703. In conclusion, we find Appellant's trial defense counsel made a reasonable tactical decision not to file a motion to dismiss or to attempt to preserve the urine sample, and that the decision was made after weighing the options and is therefore "virtually unchallengeable." *Dewrell*, 55 M.J. at 13 (quoting *Strickland*, 466 U.S. at 690).

**C. Providence of Plea**

Appellant contends that his pleas of guilty to the assault charges were not knowing and voluntary because (1) trial defense counsel misadvised him of the maximum punishment; and (2) he was not advised of the collateral consequences that his guilty plea would have on his ability to possess firearms in the future. Appellant asks that we set aside and dismiss the findings of guilty for Specifications 1 and 2 of Charge II and set aside the sentence. We disagree and find no relief is warranted.

Although we review questions of law from a guilty plea de novo, we review a military judge's acceptance of an accused's guilty plea for an abuse of discretion. *United States v. Inabinette*, 66 M.J. 320, 322 (C.A.A.F. 2008). In order to prevail on appeal, an appellant has the burden to demonstrate "a substantial basis in law and fact for questioning the guilty plea." *Id.* (quoting *United States v. Prater*, 32 M.J. 433, 436 (C.M.A. 1991)) (internal quotation marks omitted). "The providence of a plea is based not only on the accused's understanding and recitation of the factual history of the crime, but also on an understanding of how the law relates to those facts." *United States v. Medina*, 66 M.J. 21, 26 (C.A.A.F. 2008) (citing *United States v. Care*, 18 C.M.A. 535, 40 C.M.R. 247, 250–51 (C.M.A. 1969)).

Rule for Courts-Martial 910(d) provides,

> The military judge shall not accept a plea of guilty without first, by addressing the accused personally, determining that the plea is voluntary and not the result of force or threats or of promises apart from a plea agreement under R.C.M. 705. The military judge shall also inquire into whether the accused's willingness to plead guilty results from prior discussion between the convening authority, a representative of the convening authority, or trial counsel and the accused or defense counsel.

Here, Appellant has not demonstrated that there is a substantial basis to question his plea. Appellant first asserts that his plea was not knowing and voluntary because "[a]t the time his trial defense counsel announced his plea on the record, he was not sufficiently aware of the 'likely consequences.'" We first note that the ultimate responsibility for ensuring Appellant's plea of guilty was knowing and voluntary belongs to the military judge. *See United States v. Riley*, 72 M.J. 115, 122 (C.A.A.F. 2013). Here, the record clearly established that the military judge correctly advised Appellant on the maximum sentence for the offenses to which he pleaded guilty, before his guilty plea was accepted. Additionally, the record establishes that trial defense counsel corrected their mistake during a recess and again confirmed that Appellant was correctly advised of the maximum punishment and of his right to withdraw his

plea at any point before the sentence was announced. The military judge then again confirmed that Appellant was pleading guilty voluntarily and of his own free will and that he was not coerced in any way to plead guilty. The military judge went on to confirm that Appellant was satisfied with his trial defense counsel and their advice. Finally, as noted *supra*, Appellant in this case also signed a statement the day after trial confirming that he voluntarily pleaded guilty despite originally being misadvised on the maximum punishment. Therefore, we find the military judge did not abuse his discretion by accepting Appellant's guilty plea.

Appellant also alleges that his plea was not knowing and voluntary because his trial defense counsel did not advise him that he was pleading guilty to a felony-level offense which would deprive him of his right to possess a firearm. Military courts use the following test when an appellant contests the providence of a guilty plea based on the collateral consequences of a conviction:

> [T]he appellant is entitled to succeed only when the collateral consequences are major and the appellant's misunderstanding of the consequences (a) results foreseeably and almost inexorably from the language of a pretrial agreement; (b) is induced by the trial judge's comments during the providence inquiry; or (c) is made readily apparent to the judge, who nonetheless fails to correct that misunderstanding.

*United States v. Miller*, 63 M.J. 452, 457 (C.A.A.F. 2006) (quoting *United States v. Bedania*, 12 M.J. 373, 376 (C.M.A. 1982)). Here, Appellant's alleged misunderstanding was not the result of language in a plea agreement, was not induced by the military judge's comments, and was never "made readily apparent" to the military judge. In fact, the record, to include Appellant's declaration, do not suggest that Appellant was misadvised in anyway, or that there was a misunderstanding to any degree, about his ability to possess a firearm in the future. Accordingly, there is no substantial basis in the record to question the providence of Appellant's guilty plea as it relates to this matter.

### III. CONCLUSION

The findings of guilt and the sentence as entered are correct in law and fact and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d).

Accordingly, the approved findings and sentence are **AFFIRMED**.



FOR THE COURT

CAROL K. JOYCE
Clerk of the Court